WILLIAM CHURCH OSBORN and Another, Appellants, v. JOHN P. O'BRIEN, as Mayor, and Others, Constituting the Board of Estimate and Apportionment of the City of New York, and Another, Respondents.*

First Department, November 17, 1933.

* Affd.. 264 N. Y. ——.

*Harold Riegelman* of counsel [*H. H. Nordlinger* and *Jacob M. Dinkes* with him on the brief; *Nordlinger, Riegelman & Cooper,* attorneys], for the appellants.

*Vine H. Smith* of counsel [*William E. C. Mayer* and *J. Joseph Lilly* with him on the brief; *Arthur J. W. Hilly, Corporation Counsel*], for the respondents.

GLENNON, J. This is a taxpayers' action. The plaintiffs demand judgment as follows:

" 1. Directing the defendant Charles W. Berry, as Comptroller of the City of New York, to ascertain the exact portion of the sums of $13,772,127.50 and $1,369,000, respectively, which represents obligations of the City of New York for the construction and equipment of the said Washington Heights, Eighth Avenue, Church Street Line.

" 2. Directing the defendants constituting the Board of Estimate and Apportionment of the City of New York to reduce the budget for the year 1933 as finally adopted and to strike from said budget such portion of the sums of $13,772,127.50 and $1,369,000 as represents interest and amortization of the obligations issued for the construction and equipment of the said Washington Heights, Eighth Avenue and Church Street Line.

" 3. Temporarily and permanently restraining and enjoining the defendants and each of them from paying said sums or either of them or such portion thereof as it may be ascertained is the sum of money representing the interest and amortization of obligations for the construction of the said Washington Heights, Eighth Avenue and Church Street Line out of the general funds of the City of New York."

The court at Special Term denied a motion for an injunction *pendente lite.* The ground assigned was: " The Independent Rapid Transit Railroad, or System, so-called, is but one railroad and the provisions of section 137 of the Public Service Law relating to the method of providing moneys for supplying any deficiencies * * * have relation only to such operation after the completion of the

road and not to the operation of a part thereof prior to and pending such completion."

The basis of the decision apparently was that the entire Independent System is comprised of a single railroad or road, not a part thereof; and that the operation of the road cannot be said to have commenced until the entire system shall have been completed.

The appellants contend (1) that as soon as the trains ran on a regular schedule beginning September 10, 1932, over a regular route, the operation of the railroad was begun within the meaning of the Public Service Law, whether or not the construction of the entire planned railroad had been completed; and (2) that the Washington Heights, Eighth Avenue, Church Street Subway constitutes a "road or roads" within the meaning of the law. We think that the claim of the appellants is well founded.

Plaintiffs' case depends upon the construction of sections 135 to 144, inclusive, of the Public Service Law, added by chapter 573 of the Laws of 1924, regulating the municipal operation of subways. Section 135 reads as follows:

"§ 135. Municipal operation; rates of fare. If the board of transportation shall undertake or engage in public or municipal operation of any road or roads pursuant to the authority of the rapid transit act the rate of fare shall be five cents for an initial period not to exceed three years from the date of beginning such operation. If the aggregate revenues derived from the municipal operation of such road or roads during the third year of the initial period be insufficient to pay (a) operating expenses exclusive of maintenance; (b) expenses of maintenance and repairs of structures and equipment, exclusive of depreciation; (c) contributions to a depreciation fund or funds, for replacement or renewal of worn out, obsolete or inadequate units of structure or equipment; (d) the amount of interest actually payable by such city on debt incurred or obligations issued on account of such rapid transit railroad or railroads so operated and (e) contributions to sinking fund to amortize and retire the debt incurred or obligations issued by said city on account of such rapid transit railroad or railroads, the board of transportation shall within sixty days adjust, fix and readjust the rate of fare on such road or roads, so as to produce an annual income sufficient to make all such payments."

In substance the board of transportation was given a trial period of three years within which to determine whether or not a railroad could be operated at a fare of five cents, and at the same time pay out of the revenue, derived therefrom, the fixed charges, which are provided for in the act.

Section 137 is entitled "Capital for initial operations; deficiencies." It reads as follows:

"§ 137. Capital for initial operations, deficiencies. The board of estimate and apportionment or other analogous local authority is hereby authorized to provide the necessary working capital with which to begin such public or municipal operation, and from time to time during the initial period of three years after such public or municipal operation shall have been begun is authorized to provide for the payment of any expenses of operation, maintenance, interest, contribution to sinking funds, and reserves on account of depreciation, to the extent and in the amount not provided for by the revenues derived from such operation during such initial period. For such purposes such board is hereby empowered to authorize the issuance of temporary certificates of indebtedness or corporate stock notes from time to time during such initial period of operation and to replace and exchange such temporary obligations, at any time within five years after the beginning of such initial period, for rapid transit bonds or corporate stock or serial bonds of the city having a date of maturity not to exceed ten years after the expiration of such initial period of operation. Such rapid transit bonds, corporate stock or serial bonds shall be amortized within such period of ten years, and the interest payments thereon shall be provided from the revenues derived from operation after the termination of the initial period of operation, and the revenues shall be made sufficient and adequate to fully provide for all the payments required by this article in the manner heretofore prescribed. But this provision that such bonds, corporate stock or serial bonds shall be payable out of the revenues derived from operation shall not diminish or affect the obligation of said city as a debtor upon said bonds, or any other right or remedy of any holder or owner of any such bonds, to collect the principal and interest thereof."

It is quite apparent that the Legislature intended a clear and comprehensive scheme for raising funds to take care of the expense of operating the road. It will be noted that temporary certificates of indebtedness or corporate stock notes were to be issued during the "initial period" of operation, and were to be exchanged at any time within five years after the beginning "of such initial period" for rapid transit bonds or corporate stock or serial bonds of the city having a date of maturity not to exceed ten years after the expiration of the "initial period of operation."

Nothing can be found in the act which gives the defendants the right to use money which is raised by taxation for the purpose of defraying the expenses enumerated in section 135. The Rapid

Transit Act, ▮ which is specifically referred to in section 135, expressly provided that the moneys for operating expenses and other proper charges were to be raised " without recourse to taxation " (Rapid Transit Act, § 30▮).   Until section 135 of the Public Service Law was enacted, no authority was granted or given to the city to operate a railroad at a specific rate of fare of five cents.   By that enactment it was permitted to operate on that basis for a trial period of three years.   In the event that the receipts derived therefrom were insufficient, the city authorities were given express permission by section 137 to raise working capital to take care of the deficit.   While the words used are permissive in form, they are nevertheless mandatory in effect.   The provision that corporate stock or serial bonds shall be payable out of the revenues derived from operation clearly indicates the legislative intent which was also contained in the Rapid Transit Act, that they shall not be payable out of moneys raised by taxation.   The requirement that the city shall be ultimately liable upon the bonds was written in with the view of enabling it to market this special type of bond.

It is idle on the part of the city to contend that it is not a railroad within the meaning of the law, and that the " initial period of operation " has not been begun.   Here we have a railroad which carried upwards of 200,000 passengers a day at the time this action was commenced.   It is twelve and three-tenths route miles in length, and includes forty-eight track miles.

The difficulty of raising funds pursuant to the provisions of section 137 of the Public Service Law is not a matter which this court has a right to take into consideration in construing the provisions of the act.   If relief is desired, it must be sought elsewhere by proper amendments to the Public Service Law.   As the situation now stands, however, we must construe the law as it is written. We believe that appellants' right to a temporary injunction is clear and the relief they sought should have been granted.

The order appealed from should be reversed, with twenty dollars costs and disbursements, and the motion granted.

FINCH, P. J., MERRELL and TOWNLEY, JJ., concur; UNTERMYER, J., dissents.

Order reversed, with twenty dollars costs and disbursements, and motion granted.   Settle order on notice.